Claudia M. Sobarzo
John Keck, Wife and Husband
4931 E. Andora Drive
Scottsdale, Arizona 85254
Telephone (602) 774-6082

Plaintiffs *in pro per*

Document Prepared by:
Steven P. Wyner
AZCLDP #81775

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CLAUDIA M. SOBARZO and JOHN KECK, Wife and Husband,<br><br>Plaintiffs,<br><br>v.<br><br>WAL-MART INC., a Delaware corporation,<br><br>Defendant. | Case No. CV-19-5662-PHX-SPL<br><br>**CIVIL RIGHTS COMPLAINT WITH REQUEST FOR TRIAL BY JURY** |

Plaintiffs Claudia Sobarzo and John Keck are wife and husband, complain against Defendants and request trial by jury as follows:

## I. INTRODUCTION

Wal-Mart Inc., a Delaware corporation, ("Wal-Mart") is the largest retailer in the world and the largest private employer in the United States. It is the industry leader not only in size, but also in its failure to advance its female employees.

1

A.  **Wal-Mart Employee Demographics**

1. There are two workforces at Wal-Mart. By far the largest workforce is female, which comprises over 72% of the hourly sales employees, yet only one-third of management positions. This workforce is predominantly assigned to the lowest paying positions with the least chance of advancement.

2. The other workforce is male. This workforce is the reverse image of the female workforce - it comprises less than 28% of the hourly sales workers, yet holds two-thirds of all store management positions and over 90% of the top Store Manager positions. This disparate distribution of the genders is the result of purposeful discrimination and of practices that serve no reasonable business purpose yet have a disproportionate impact on women.

B.  **Wal-Mart Hourly Workers / Management**

3. Hourly workers are the first and the lowest segment in the Walmart job hierarchy tree even though some of these hourly workers may be considered managers although they do not manage or supervise other employees. This segment is mainly comprised of entry level positions included but not necessarily limited to:

- The cashier- the individual is supposed to man the cash counter and fulfill billing related responsibilities.
- The sales associate- the individual is required to assist the customer in-store.
- HD/ HM on
- Customer Support Manager- the individual is needed to cater to all customer support related issues that may arise.
- Department Manager- the individual is responsible for the management of a particular department.

- Support Manager – the individual is responsible for specialty departments in some locations.

**C.    Wal-Mart's In- Store Managers**

4.    Wal-Mart's In-store managers are the next segment of the Walmart job hierarchical structure and is located in the middle tier of the <u>Walmart Business hierarchy structure</u> and generally manage or supervise employees. The positions included in the segment are comprised of individuals who have a greater responsibility as manager and hence require a set of interpersonal skills to fulfill their job responsibilities. The positions in the segment are listed here-

- The assistant manager- this position is inferior to the co-manager and manager positions and is instilled to provide basic assistance to the manager and co-manager positions.
- The co- manager- this position, though not inferior, is a counterpart to the manager position.
- Manager- the individual is required to carry on the highest level of in-store management duties.

**D.    Wal-Mart's Employee Open Door Policy**

5.    Wal-Mart promotes a so called Open Door Policy which according to its website at https://www.walmartethics.com/content/walmartethics/en_us.html is part of its efforts to build a culture of trust by learning to speak up when something's not right (without fear of retaliation) so that Wal-Mart can address the problem. Wal-Mart claims this Open Door Communications process is the most direct way to voice any concern to a manager, and encourages employees who believe their immediate manager is involved in the problem, to discuss the issue with the next level of management who is not

involved, or they can also use the Open Door Helpline for that purpose, they can also use the Internet, email, phone or regular mail to bring a grievence to the attention of management.

## II. NATURE OF ACTION

6. Plaintiffs bring this action for discrimination in employment and retaliation for opposing that discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), as amended and against her former employer Wal-Mart Stores Inc, Inc. ("Defendants" or "Wal-Mart").

## III. JURISDICTION AND VENUE

7. This Court has original federal question jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a) for the claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.

8. Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b), as the acts and transactions giving rise to Plaintiffs' action occurred in this district, Plaintiffs reside in this district, and Defendants transact business in this district.

## IV. PARTIES

9. Plaintiff Claudia M. Sobarzo is an adult Hispanic female residing in the State of Arizona, County of Maricopa, City of Scottsdale, and at all relevant times complained of herein was an employee of Wal-Mart.

10. Plaintiff John Keck is an adult male is co-Plaintiff in this action by virtue of his being married to Plaintiff Claudia Sobarzo at all relevant times complained of herein and has thereby suffered damages as well.

4

11. Ms. Sobarzo was first employed by Wal-Mart in Arizona on or about April 15, 2002, as an hourly employee where she worked at one of its stores in Phoenix located at Tatum and Bell Road, as a parking lot shopping cart pusher. She later served in a variety of hourly positions until her eventual promotion as assistant manager in 2015, and her subsequent termination and separation from Wal-Mart on October 9, 2018.

12. Defendant Wal-Mart Stores, Inc., is a publicly traded Delaware corporation authorized to conduct its business in this jurisdiction, with its principal place of business in Bentonville, Arkansas

## V. **FACTUAL ALLEGATIONS**

**A. After Thirteen Years at Wal-Mart, Where She Began Work as an Hourly employee in 2002, Ms. Sobarzo was promoted to Assistant Store Manager of a Store That Generated Millions in Annual Revenue for the Company**

13. Plaintiff Claudia M. Sobarzo began working for Defendants in the lowly hourly position of parking shopping cart pusher on or about April 15, 2002.

14. By 2007 she had worked in various other positions that included overnight stocking of inventory, deli sandwich preparation and a host of other low-level positions.

15. During this period, she was paid on an hourly basis and subject to earning overtime pay for what many times amounted to working sixteen-hour shifts.

16. By 2013 she had happily and successfully worked at several Wal-Mart store in various non-management positions in the greater Phoenix area without incident or complaints from management, when Defendant promoted Ms. Sobarzo to the position of Assistant Store Manager at their store No. 4232 located in Phoenix, Arizona.

17. Although at first she was reluctant to accept this position whereas it was a salaried position without overtime benefits (actually representing a reduction in pay) she nevertheless saw it as tremendous opportunity to excel in her career at Wal-Mart and was confident that her many years of hard work at Wal-Mart had finally paid off.

18. Little did she know the achievement of her hopes and dreams would soon turn into a prolonged nightmare that would ultimately result in her wrongful termination.

19. As Assistant Store Manager, Ms. Sobarzo was not responsible for managing or supervising employees but was actually involved in doing much of the menial work she had always done, and had come to discover that in large part the title of assistant manager was actually a misnomer.

20. Ms. Sobarzo soon realized that Wal-Mart was essentially using her for the same work as always but had now figured a way to get the same work out of her while avoiding paying her overtime under color of her now being a salaried assistant manager.

**B.  Wal-Mart Management Fostered a Hostile Workplace Environment Consisting of Verbal Abuse, Threats, Humiliation, Intimidation, and Interference Against Ms. Sobarzo That Prevented or Sabotaged Her Efforts to Effectively Get Her Work Done**

21. Plaintiffs repeat and re-allege each and every factual allegation contained above.

22. Despite her strong performance and excellent reputation at Wal-Mart for some 13 years she was employed there that ultimately led to her being promoted into the lower rungs of management Ms. Sobarzo for reasons unknown to her to this day was thrust into a hostile workplace environment where she immediately experienced a pattern

of bullying by both men and woman supervisors characterized by verbal abuse, threats, humiliation, intimidation, and interference to the extent her efforts to effectively get her work done each day were prevented or sabotaged by her immediate supervisors.

### *The Paperwork Incident*

23. The Wal-Mart store in which her entry into management, the began No. 4232 comprised of upper department managers who were charged with supervision over Ms. Sobarzo and Ms. Sobarzo was responsible for stocking the toy and electronics department.

24. From the outset Ms. Sobarzo was met with embarrassment and derision by them notwithstanding having worked for Wal-Mart for so many years without incident.

   a. One week into commencing her new assistant manager position she was unexpectedly accused of falsifying paperwork when one of her managers, a Ms. Offa handed her a form and asked her to complete it before 5 p.m.

   b. When Ms. Sobarzo asked her for instructions on how to complete the form she'd never seen before Heather (the store manager) agreed to do so later but then was called away on an emergency calling for her to leave work early.

   c. When Ms. Sobarzo asked another manager named Heather to help her Heather informed her the papers were "B.S," and instructed Ms. Sobarzo to simply answer yes to all the questions contained in the paperwork, insert a check mark indicating audit is complete and that no further action would be need to be taken.

25. As a result of the aforementioned incident Ms. Sobarzo was left with the distinct impression that what she had been instructed to do by Heather was not only

7

wrong, but intentionally wrong, and asked for Heather to walk her through completing the paperwork since she did not fully understand the underlying principles of the paperwork which dealt with such unfamiliar things as where cash office books were kept and did not fully understand any other of the questions in the paperwork, to wit, Heather replied, ". . . this is how we all do it, Vanessa (the assistant store manager) never checks them, so don't worry," or words to that effect.

26. Ms. Sobarzo then asked at least two more associates and got essentially the same apparently intentional false answers from them.

27. After Ms. Sobarzo turned in the paperwork to Ms. Offa, she was called into Vanessa's office at which time Vanessa questioned her about the front-end audit which was what the subject paperwork actually dealt with.

28. When Ms. Sobarzo indicated that she did not know how to complete the paperwork and had been assisted by other assistant managers who told her the audit was B.S. and that this is how we all complete the forms.

29. Vanessa then treated Ms. Sobarzo as if she had falsified cash office records and informed her that that could lead to termination.

30. Vanessa then asked another manager named Yvette (a so called co-manager) to fax the paperwork to a Laura Campos, and informed Ms. Sobarzo that the other managers, presumably Heather and the other two associates, told her that she did have to do them that it (the paperwork) was a joke and she was just going write anything, to wit, Ms. Sobarzo was dumfounded and sensed she was being set up for failure and abuse for reasons unknown to her at the time or to this day.

31. Following this incident, Ms. Sobarzo was told by Vanessa to go home and wait for Laura Campos to contact her regarding the consequences of her alleged actions, thereby embarrassing her and leaving her in a quandary with respect to her future at Wal-Mart.

32. Laura Campos did contact Ms. Sobarzo a few days later and explained how serious the aforementioned incident was, resulting in a verbal warning and (confusingly) admonishing her to not trust anyone in that store.

33. Ms. Sobarzo then returned to work the next day hurt and embarrassed and felt at a professional disadvantage when she walked in the office where all the managers had gathered.

34. Nevertheless, she completed her assigned tasks as set forth in writing including but not limited to mopping the so-called grocery alley (or aisle), cleaning all freezer and dairy doors, and dusting off the freezer sidekicks or endcaps.

35. Thereafter Vanessa called her into her office whereat she was lectured by Vanessa and falsely accused of not completing her assigned tasks.

36. After six (6) months of working 16-hour shifts and minimal days off Ms. Sobarzo had finally managed to earn Vanessa's trust and respect or so she thought.

37. One morning Vanessa called Ms. Sobarzo into her office and asked why she had not transferred to another store, to wit, Ms. Sobarzo asked what she had to do to

satisfy Vanessa and be a part of the team, and was simply told that what would make the team happy is if Ms. Sobarzo would transfer to another store.[1]

38. Shortly thereafter, for reasons not known to Ms. Sobarzo, Vanessa began to accept her (or so she thought again) and made her a part of the team, and she experienced no further problems for the next several months.

39. Also, most of the original management team had left as well and Ms. Sobarzo was instrumental in assisting all new managers to acclimate.

### The (alleged) Stolen Shoe Incident

40. On or about October 4, 2016, after a long shift Ms. Sobarzo was asked by Vanessa and c co-manager named Maria to clean the deli in anticipation of an inspection visit by upper management the following day. Her duties for included washed down walls and floors of the walk-in cooler and wherever else cleaning was necessary.

41. Upon nearly completing her assigned cleaning tasks the heavily concentrated blend had splashed onto her shoes, pants, hands, and arms. While the bleached did wash off her hands and arms it would not wash off her shoes.

42. By now the bleach was burning her skin and feet. As she walked toward the backroom of the store, she noticed a pair of shoes that were similar to the ones she was wearing that had been destroyed by the bleach selling for $10.00.

43. She then took them off the shelf and explained to supervisors Tyrone, Maria, David and Nina that feet were burning really bad and that she has use the (new) shoes as she could no longer stand the pain caused by the bleach.

---

[1] Wal-Mart employee transfers between stores in such instances are not necessarily handled internally. The employee is expected to in effect apply for a job at another store. If the employee is unable to find a position at another store, she is subject to termination from Wal-Mart.

44. They all laughed at her but at least David told her to scan the shoes out in order to account for them, but no scanner was readily available. Accordingly, Ms. Sobarzo place a price tag representing the shoes in the store claims container next to the claims cage so the cost of the shoes could then be charged to her later, which she did.

45. She removed the price tag and put on the (new) shoes but by now her feet had begun to blister so she permission to go home which was granted by David.

46. After being off for the next couple of days to recover and upon returning to work she returned the (new) shoes to customer service and was assured they would be properly processed back into inventory.

47. Notwithstanding having returned to the shows, on October 8, 2016, Ms. Sobarzo was falsely accused by Laura Campos of wearing the shoes at a meeting the previous day even they had been returned to inventory.

48. When she offered to show Laura and Jason the shoes were Skechers brand not Daskin, the Wal-Mart brand, and further explained she had two pairs of Skechers and had thrown bleached Skechers away and had returned the Daskins to the store, they showed no interest and otherwise ignored her.

C. **Wal-Mart Fostered Gender and Race Based Discrimination Against Ms. Sobarzo by the Male and Female Managers She was Supervised By**

49. Plaintiffs repeat and re-allege each and every factual allegation contained above.

*The (alleged) Stolen Inventory Incident*

50. Following the departure of the original management team as set forth above the replacement management team consisted primarily of males, one of whom was Jason.

11

51. One day Jason had suddenly and unexpectedly falsely accused Ms. Sobarzo of stealing from inventory without having ever presented her with any evidence whatsoever in support of his claim other than the rest of the management team had claimed to have witnessed her stealing thousands of dollars in merchandise.

52. After taking some three (3) months to clear herself she was finally offered a demotion to another Wal-Mart Store located at 83rd Avenue and Union Hills in Glendale, Arizona.

53. There, she was immediately met with an *all eyes on her approach* by store management. And it wasn't long before rumors started spreading that she steals and puts the blame on others.

54. Accordingly, on the basis of such rumors, Ms. Sobarzo was placed under heavy supervision when working with high priced merchandise.

55. She was also told she was prohibited from unloading trucks as thousands of dollars of merchandise had been missing, somehow implying she was complicit in the missing merchandise but not providing proof thereof or making formal charges with law enforcement.

56. She was then moved to apparel to stock markdown merchandise and fix merchandise bins. These tasks were unusually hard work requiring assistance, however her requests for help were summarily declined by management.

57. Since she was afraid of further hostility and the possibility of losing her job, she continued doing these demeaning tasks without assistance and to her physical and emotional detriment.

58. Later, she walked in on a conversation where a co-manager was making fun of her and calling her a thief, calling her fat, and mimicking her as follows: *I'm Claudia and I can't stop eating so I eat non-stop and don't pay that's why I was fired from the other store.*

59. Gail and another co-manager Selena were also mimicking mocking her walk as she had been suffering from stage 3 gout and walked with a I limp from the pain it caused.

60. Supervisors Megan and Chris lecture Ms. Sobarzo about co-manager Gail stating that she was the so-called Queen there, and what she said goes and that she did not want Ms. Sobarzo to work there.

### *The False Background Check Incident*

61. On February 1, 2016, Ms. Sobarzo was summoned to manager Terry Doe's office in connection with questions about her employment application that dated back 2002.

62. There had been store managers meeting based on management having received an email from Wal-Mart's corporate office instructing them to fire Ms. Sobarzo for allegedly falsifying her employment records in 2002.

63. Specifically, Terry informed her that she had lied on her employment application. She explained to Terry that she had that had informed her hiring manager, Ruth at store #1598 that I had a charge against her from 1994 while in high school and under Arizona Child Protective Services protection.

13

64. The case involved her having received an extra Child Protective Services check and inadvertently not reporting it.

65. A week later, she was informed by Ruth she was hired and asked to attend orientation the next day, April, 15th 2002. I was so happy and excited.

66. Wal-Mart ran several more routine background checks through the years and each time she passed them without question.

67. Notwithstanding the foregoing, Terry was now claiming irregularities in her background that warranted her employment with Wal-Mart being terminated, even though when she checked with the company who performed background checks for Wal-Mart she was assured there were no such irregularities and that she had been cleared in her last background check.

68. It became clear to Ms. Sobarzo that Terry had concocted a false reason to terminate her.

### *Terminations and Subsequent Rehiring*

69. Following her termination Ms. Sobarzo through Wal-Mart's Open-door policy contacted corporate headquarters and managed to secure her rehire.

70. Thereafter Ms. Sobarzo worked at other Wal-Mart stores around Phoenix and each time experienced gender and race-based discrimination against her by the male and female managers she was supervised by until she was terminated for good on October 9, 2018.

D. **Wal-Mart's Filing of False Police Reports Against Plaintiffs For Shoplifting;**

71. Plaintiffs repeat and re-allege each and every factual allegation contained above.

72. Following Ms. Sobarzo's final termination on she occasionally was a customer of the Wal-Mart she had been terminated from.

73. On one such occasion Plaintiffs while shopping with their child were accused of fraud and fraudulent when they were actually attempting to return items they had purchased.

74. On another occasions Plaintiffs while shopping with their child were accused of shoplifting items they had already paid for.

75. On both of the aforementioned occasions Wal-Mart failed to show Phoenix Police exculpatory video evidence that would have disproven their accusations. Phoenix in turn submitted the cases to the Maricopa County Attorney under Maricopa County Superior Court case No. S-0700-CR-1998008839 and to the Phoenix Prosecutor under Phoenix Municipal Court case No. M-0741-5436665. Both of these cases were subsequent dismissed.

76. A third such case remains pending before the Court and it is anticipated will be dismissed.

E. **Wal-Mart's Senseless Series of Retaliatory Conduct and False Charges Against Ms. Sobarzo After Her Loyally Serving Over Fifteen Years Has Caused Her to Suffer Significant and Irreparable Damages**

77. Plaintiffs repeat and re-allege each and every factual allegation contained above.

78. For the reasons set forth hereinabove, Plaintiffs have unfairly and unjustly suffered significant financial damages and damages to their reputations not the least of which is having to fight false criminal charges in Court, all in an amount to be proven at the trial of this matter.

79. The aforementioned pattern of bullying, wrongful terminations, and retaliation against Ms. Sobarzo represents not a simple case of teasing or off hand comments made to and about her by fellow management or supervisors, but the egregious conduct of these employees constitutes violations of federal or state laws prohibiting discrimination and illegal harassment in the workplace that protect employees from harassment based on protected characteristics, such as race, color, national origin, religion, sex, age, or disability, and thus creating a hostile work environment, as their conduct was:

   a. So objectively offensive as to alter the conditions of Ms. Sobarzo's individual employment at Wal-Mart, whereas the harassment against her culminated in a tangible employment action against her and/or was sufficiently severe or pervasive. See *Oncale v. Sundowner Offshore Services*, 523 U.S. 75 (1998); and,

   b. Was severe enough to create a work environment that a reasonable person would consider intimidating, hostile, or abusive. See *A.R.S. 41-1463*.

# COUNT I

## (Sex Discrimination under Title VII and the PHRA)

80. Plaintiffs repeat and re-allege each and every factual allegation contained above.

81. Through the above-described conduct, Defendants intentionally violated Ms. Sobarzo's right to be free from sexual discrimination in employment under Title VII.

82. Ms. Sobarzo filed timely charges of sex discrimination and retaliation with the EEOC and has received notification of her right to sue from the EEOC, and she has therefore exhausted all administrative remedies under Title VII.

**WHEREFORE**, Ms. Sobarzo seeks the following relief:

1. A declaratory judgment that the practices complained of herein are unlawful under Title VII;

2. Back pay, front pay and other damages in the form of lost wages, lost or reduced benefits, and prejudgment interest to the fullest extent permitted under the law;

3. Compensatory, liquidated and punitive damages to the fullest extent permitted under the law;

4. Litigation costs, expenses, and attorneys' fees to the fullest extent permitted under the law; and

5. Such other and further relief as this Court deems just and proper.

# COUNT II

## (Retaliation under Title VII)

83. Plaintiffs repeat and re-allege each and every factual allegation contained

above.

84. As described, Ms. Sobarzo engaged in the protected activities of opposing Defendants' discriminatory acts made unlawful by Title VII by reporting managers of Wal-Mart's discriminatory and retaliatory conduct to her supervisors and through Defendant's Open-Door Policy program. Defendants made Ms. Sobarzo performance of her job intolerable and impossible by subjecting her to an endless series of retaliatory investigations, manufactured complaints of her discriminatory superiors.

85. Defendants took the above-described adverse actions against her by subjecting her to retaliation resulting in her wrongful termination multiple times in violation of her rights under Title VII.

86. Plaintiffs have exhausted all prerequisite administrative remedies.

**WHEREFORE**, Plaintiff seeks the following relief:

1. A declaratory judgment that the practices complained of herein are unlawful under Title VII and the PHRA;

2. Back pay, front pay and other damages in the form of lost wages, lost or reduced benefits, and prejudgment interest to the fullest extent permitted under the law;

3. Compensatory, liquidated and punitive damages to the fullest extent permitted under the law;

4. Litigation costs, expenses, and attorneys' fees to the fullest extent permitted under the law; and

5. Such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a jury trial as to all claims so triable.

RESPECTFULLY SUBMITTED this 21st day of November, 2019.

**CLAUDIA M. SOBARZO**　　　　　　　**JOHN KECK**

_____　　　　　_____
Claudia M. Sobarzo　　　　　　　　　　John Keck
Plaintiff *in Pro Per*　　　　　　　　　　Plaintiff *in Pro Per*

## VERIFICATION

STATE OF ARIZONA　　) 
County of Maricopa　　) ss.

Claudia M. Sobarzo, being first duly sworn, upon his oath, deposes and states:

That she is one of the Plaintiffs in the foregoing Complaint; that she has read the foregoing Complaint, and knows the contents thereof and the matters and things stated therein are true to his own knowledge, except as to those matters stated therein upon information and belief, and as to those matters she believes them to be true.

_____
Claudia M. Sobarzo

SUBSCRIBED AND SWORN to before me this 21st day of November, 2019, by Claudia M. Sobarzo.

_____
Notary Public

MY COMMISSION EXPIRES: 2/18/2022



STEVEN P WYNER
Notary Public, State of Arizona
Maricopa County
My Commission Expires
February 18, 2022

STATE OF ARIZONA )
County of Maricopa ) ss.

John Keck, being first duly sworn, upon his oath, deposes and states:

That he is one of the Plaintiffs in the foregoing Complaint; that he has read the foregoing Complaint, and knows the contents thereof and the matters and things stated therein are true to her own knowledge, except as to those matters stated therein upon information and belief, and as to those matters he believes them to be true.

_____
John Keck

SUBSCRIBED AND SWORN to before me this 21st day of November, 2019, by John Keck.

_____
Notary Public

MY COMMISSION EXPIRES: 2/18/2022

STEVEN P WYNER
Notary Public, State of Arizona
Maricopa County
My Commission Expires
February 18, 2022